IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JUAN IVAN COLON-GONZALEZ,

Plaintiff,

v.

COMMONWEALTH OF PUERTO RICO, et al.,

Defendants.

CIVIL NO. 17-1162 (CVR)

**OPINION AND ORDER**

**INTRODUCTION**

Plaintiff Juan Iván Colón-González ("Plaintiff") brings forth the present case against the Commonwealth of Puerto Rico, the Puerto Rico State Commission on Elections ("CEE" for its Spanish acronym), and its President, Liza M. García-Vélez ("President García"),[1] in her personal and official capacities ("Defendants"). Plaintiff claims that he was discriminated against and unjustly terminated from his career position with the CEE on June 30, 2015. Plaintiff raises a myriad of claims under several federal and state statutes, most of which were dismissed at the motion to dismiss stage. (Docket No. 53).

On August 2, 2017, the Court stayed this case under Title III of the Puerto Rico Oversight Management and Economic Stability Act ("PROMESA"), 48 U.S.C. §§ 2101-2241. (Docket Nos. 19 and 20). On July 19, 2019, the case was reopened to allow it to move forward until final judgment for the limited purpose of enforcing any possible

---

[1] García was President of the CEE when this case was filed. She has since been automatically substituted as a Defendant by Francisco Rosado Colomer and now Jessika Padilla Rivera. See Fed. R. Civ. P. 25(d).

judgment ordering Plaintiff's reinstatement.  (Docket No. 28).  The limitation imposed by the Court was later expanded on reconsideration, permitting the back pay claim under Title VII to also move forward.  (Docket No. 74).

At this juncture, what remains are Plaintiffs claims for discrimination on the basis of sex pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(a)), and on the basis of age pursuant to the Age Discrimination in Employment Act (29 U.S.C. § 621, *et seq*., "ADEA"). The claims against President García in her personal capacity were previously dismissed, and only the official capacity claims against the office remain alive.

Before the Court now is Defendants' "Motion for Summary Judgment and Memorandum of Law in Support Thereof" (Docket No. 83), as well as Plaintiff's Opposition thereto (Docket Nos. 95 and 114), Defendants' Reply (Docket No. 102) and Plaintiff's Sur-reply (Docket No. 109).

For the reasons explained below, Defendants' Motion for Summary Judgment is GRANTED.

### STANDARD

Summary judgment is appropriate if "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 (a) and (c).  Pursuant to the explicit language of the rule, the moving party must establish this two-fold element.   Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997). A fact is deemed material if it could potentially affect the outcome of the suit. Id. Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Id. At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment. A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must then "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56 (c). If they so wish, they may submit a separate statement of facts which they believe are in controversy.

Time and again, the Court of Appeals for the First Circuit ("First Circuit") has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); see also Colón v. Infotech Aerospace Servs., Inc., 869 F.Supp.2d 220, 225-26 (D.P.R. 2012).

Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is - and what is not - genuinely controverted.'" Calvi v. Knox Cnty, 470 F.3d 422, 427 (1st Cir. 2006)). Facts which are properly supported "shall be deemed admitted unless properly controverted" and the Court is free to ignore such facts that are not properly supported. Loc. Rule 56(e); Rodríguez-Severino v. UTC Aerospace Sys., 52 F.4th 448 (1st Cir. 2022).

Local Rule 5(g) and 48 U.S.C. § 864 impose an additional requirement, that all filings made in cases before the United States District Court should either be in English or accompanied by a certified English translation thereto. Failure to comply with this directive shall result in the Court not considering the materials.

At the outset, the Court must mention that Plaintiff's Opposition was non-compliant with the rules, for several reasons. First, the rules require that the party in opposition must either admit, deny, or qualify and submit the opposing party's proposed fact, together with a corresponding citation to the record. Plaintiff's citations for several of Defendant's proffered facts were unduly lengthy and argumentative. See e.g., Plaintiff's opposition to Uncontested Fact Nos. 4, 6, 21, and 33. For example, Plaintiff's proffered opposition to Defendant's Uncontested Fact No. 4 alone consisted of a page and a half of factual assertions and citations. The opposition to Uncontested Fact No. 43 alone was four (4) pages long. (Docket No. 95, Exhibit 1, pp. 8-12). The information contained in these four (4) pages, in turn, was later copied and pasted as part of the 111 additional facts Plaintiff submitted in support of his Opposition, many of them several sentences long. See Id., pp. 25-32. This is non-compliant with the rule, as the latter requires a party to

simply submit a "separate, short and concise" statement in opposition to the moving party's facts.

Second, Plaintiff's denials in opposition were non-responsive and failed to controvert the facts in question. For instance, referring to the way in which Plaintiff was hired, Defendants' Uncontested Fact No. 4 states, "[t]his announcement was not an open notice to fill a position, but a service request for contract services. See Deposition of Enid Rodríguez Román, October 12, 2022 (Exhibit A), page 36, lines 5-13." (Docket No. 84, p. 4). In opposition thereto, Plaintiff gives a long-winded explanation of his duties, how he worked forty (40) hours a week, stating that he was a career and not a trust employee, explaining the principle of merit, and detailing how the position was created, among others. While this lengthy presentation of additional facts may explain why he believed the position was a career and not a trust appointment, none of it serves to controvert the testimony given, under oath, that the opening was a request for services *under a contract* and not a regular opening. Indeed, this was the same contract for professional services that Plaintiff signed upon being hired. Plaintiff's denials to Defendants' facts all suffered from this malady, and simply failed to controvert the fact in question.

Lastly, and to make matters worse, Plaintiff offered sixty-three (63) exhibits in support of his Opposition, most of them being documents from his personnel file and which were mostly in the Spanish language, in violation of Local Rule 5(g). When Plaintiff filed his Opposition on March 31, 2023, he sought an extension of time to file the corresponding translations, which the Court granted. (Docket No. 97). At that time, the Court explicitly warned Plaintiff that "[p]ursuant to Local Rule 5(g) and 48 U.S.C. § 864, all filings should either be in English or accompanied by a certified English translation.

Certified English translations are due on 04/30/2023.  No extension will be granted."

(Docket No. 99).  Plaintiff did not file the translations pursuant to the Court's original

order.  Almost a year later, on January 9, 2024, this case was assigned to the

undersigned's docket and a review of the record shows Plaintiff simply never complied

with the Court's order then, or at any time thereafter.  Plaintiff likewise failed to request

an additional extension of time to file the translations.

Twenty (20) years ago, the First Circuit held that "[t]he district court should not

have considered any documents before it that were in the Spanish language."  González-

De-Blasini v. Family Dep't, 377 F.3d 81, 89 (1st Cir. 2004).  In line with this holding, the

First Circuit has further found that "it is the independent duty of the district court to make

sure that '[a]ll pleadings ... be conducted in the English language.'"  United States v.

Rivera-Rosario, 300 F.3d 1, 6 (1st Cir. 2002) (quoting 48 U.S.C. § 864).  "This duty must

not be taken lightly, as it ensures that the District of Puerto Rico remains an integrated

part of the federal judiciary".  Id.;  see  also Estades-Negroni v. Assocs. Corp. of N. Am.,

359 F.3d 1, 2 (1st Cir. 2004) (where the First Circuit discussed the importance of the

English-language requirement and held that "federal litigation in Puerto Rico [must] be

conducted in English");  see also United States v. Millán-Isaac, 749 F.3d 57, 64 (1st Cir.

2014)(finding that "federal judges must not consider any untranslated documents placed

before them" that were not in the English language).

The First Circuit has strictly enforced this rule where, as in the present case, the

Spanish language document or matter is key to the outcome of the proceedings in the

district court.  Puerto Ricans for P.R. Party v. Dalmau, 544 F.3d 58, 67 (1st Cir. 2008).

Allowing Plaintiff, and the Court, to rely on non-English language documents would be

"at odds with the premise of a unified and integrated federal courts system" and furthermore, constitutes reversible error. Estades-Negroni, 359 F.3d 1, 2; see also Rivera-Rosario, 300 F.3d at 10; Puerto Ricans for P.R. Party, 544 F.3d at 67.    None of the documents contained in Plaintiff's personnel file, including his own deposition testimony, were translated.   Plaintiff's failure to provide a translated copy of the documents he intended to rely on to support his arguments is fatal to his case.   Olympic Auto. & Accessories v. Puerto Rico Elec. Power Auth., 83 F.Supp.3d 416, 418-19 (D.P.R. 2015); Puerto Ricans for P.R. Party, 544 F.3d at 67.  Consequently, the Court cannot consider the documents accompanying Plaintiff's Opposition or the documentary citations in support of his arguments for which no English translation was supplied.

Many of these documents, in turn, were also used in support of the 111 additional facts Plaintiff offered as part of his Opposition.  For these reasons, the Court admitted all of Defendants' uncontested facts and did not consider any of Plaintiff's proffered facts based on the untranslated documentary evidence.[2]

### UNCONTESTED FACTS

1. Plaintiff Juan Iván Colón González is of legal age and resident of Bayamón, Puerto Rico.  (Docket No. 1, ¶ 10).

2. The CEE is an agency of the Commonwealth of Puerto Rico whose mission is to guarantee the right of all voters to exercise their vote in a democratic electoral process. (Docket No. 1, ¶¶ 12 & 18).

---

[2] The Court must also mention that Plaintiff failed to comply with the undersigned's Order to submit a timely courtesy copy of his dispositive motion materials to chambers.  (Docket Nos. 111 and 113).  The courtesy copies were due on February 2, 2023, a deadline which Plaintiff himself asked for, and were received 18 days late, on February 20, 2024. (Docket No. 112).

3. On May 17, 2003, the CEE published a job announcement in a newspaper announcing it was seeking an Administrator for its Child Care Center. The announcement listed several academic and experience requirements for the position. (Docket No. 1 ¶¶ 19 & 20).

4. This announcement was not an open notice to fill a position, but a service request for services on a contract basis. (D. Exhibit A, p. 36, l. 5-13).

5. After competing with other candidates and going through an interview process, Plaintiff was selected by a committee to occupy the position of Administrator of the CEE Child Care Center. (Docket No. 1, ¶¶ 21 & 23).

6. This selection process was different from the merit principle selection process applicable to vacancies for career positions. (D. Exhibit A, p. 46, l. 21-25; p. 47, l. 1-21).

7. Initially, Plaintiff started rendering services as Administrator through a professional services contract. The contract was for one (1) year and indicated that it did not give Plaintiff any regular status or benefits as a regular employee of the agency. (D. Exhibit B, p. 17, l. 11-16, 24-25; p. 18, l. 1-6; D. Exhibit C).

8. The reason for the initial transitory status, which was a status shared with other agency personnel at the time, was the temporary nature of the funds assigned to run the childcare program. Once the Puerto Rico Legislature assigned permanent funds for the program, a process was commenced to convert the positions into permanent ones. (D. Exhibit B, p. 40, l. 1-17).

9. On January 26, 2004, the status of the position of Administrator of the Child Care Center was changed from a contract basis to a transitory trust position at

the CEE.  (D. Exhibit B, p. 23, l. 22-25; p. 24, l. 1; p. 25 l. 2-4; p. 26, l. 10-13; D. Exhibit D).

10. In the "Notification of Appointment and Oath", the personnel transaction was marked as an appointment to a trust position. This document was signed by Plaintiff under oath and before a notary public.  (D. Exhibit D, § 10).

11. On January 21, 2009, the position was reclassified from a transitory to a permanent trust employee at the agency.  (D. Exhibit B, p. 35, l. 13-23; D. Exhibit E; D. Exhibit F).

12. The CEE has various categories of trust employees, being an agency in which political party balancing is required.  Certain trust employees reported directly to and worked directly under the President, and others worked under the permanent inscription officers.  (D. Exhibit A, p. 21, l. 23; p. 22, l. 1-16).

13. Trust employees at the CEE must earn and enjoy the trust of the person they respond to.  (D. Exhibit A, p. 25, l. 6-22).

14. After Plaintiff became a permanent trust employee, in a letter dated June 29, 2009, then CEE President Ramón E. Gómez Colón notified him that, as a trust employee he could be freely removed from his position, and that it did not entitle him to be appointed to any career position at the CEE, either as a transitory or as a permanent employee.  Plaintiff's position reported directly to the CEE President and formed a part of that office.  (D. Exhibit F).

15.  Originally, the Child Care Center was meant to care only for children of CEE's employees, but eventually children of employees of other Commonwealth agencies were enrolled.  (Docket No. 1, ¶ 33).

16. As Administrator, Plaintiff was in charge of all matters related to the administration and the management of the Child Care Center.  (D. Exhibit B, p. 72, l. 12-15).

17. As Administrator, Plaintiff also had the responsibility of appearing before other agencies in matters relating to licenses and inspections.  (D. Exhibit B, p. 95, l. 20-23).

18. As Administrator, Plaintiff was also in charge of the Child Care Center's security system, which was essential for its operation.  (D. Exhibit B, p. 103, l. 22-24; p. 104, l. 1- 24).

19. Plaintiff's duties included planning, directing, coordinating, supervising, and evaluating activities pertaining to the Child Care Center, to be carried out with initiative and independent criteria. He supervised all administrative activities at the Child Care Center, as well as the recruitment, selection and training of personnel, children development and parental orientation regarding the services it offered.  He also dealt with emergency situations, created his own budget for approval, and controlled the Child Care Center's funds as well as the equipment assigned to it.  (D. Exhibit G).

20. For Enid Rodríguez Román ("Ms. Rodríguez"), the CEE's former Human Resources Director, the position of the Child Care Center Administrator is "a highly sensitive post that requires a lot of trust, unlike a career employee position, which is basically a service position based on continuing to provide a certain service and complying with certain public policies."  (D. Exhibit A, p. 48, l. 7-14).

21. The decision to classify the position of Child Care Center Administrator as a trust position was made by the CEE's president at the time and approved by the Commonwealth's Office of Management and Budget, because he understood that the person was going to be responsible for creating the public policy for the Child Care Center.  (D. Exhibit A, p. 51, l. 11-17).

22. Regarding the classification as a trust position, the CEE's president, as nominating authority, believed that it was a highly sensitive position which involved working with children and with situations requiring high levels of confidentiality involving those children, in addition to other confidential duties that were delegated to that employee.  This was the position of past CEE's Presidents Aurelio Gracia and Ramón Gómez Colón.  (D. Exhibit H, p. 63, l. 15-25; p. 64, l. 1-19).

23. On November 9, 2010, Plaintiff requested the reclassification of his trust position to career status to then CEE President Héctor J. Conty Pérez ("President Conty").  (D. Exhibit I).

24. Changing the classification of a position at the CEE entailed an evaluation and approval of the request by the CEE's president, as the nominating authority. Final approval rested with the Commonwealth's Office of Management and Budget.  (D. Exhibit H, p. 121, l. 5; p. 122, l. 1-10).

25. On May 16, 2011, Ms. Rodríguez, as Director of Human Resources, analyzed Plaintiff's reclassification request and recommended that President Conty deny the request, insofar as the reasons for the change were not justified.  (D. Exhibit J).

26. On May 23, 2011, based on Ms. Rodríguez' recommendation, President Conty denied Plaintiff's reclassification request.  Plaintiff did not appeal this administrative decision.  (D. Exhibit K. D. Exhibit B, p. 110, l. 1-24).

27. A few years later, on February 10, 2014, Plaintiff again requested to then CEE President Angel González Román ("President González") the reclassification of his trust position to a career position.  (D. Exhibit L).

28. On June 24, 2014, Ms. Rodríguez again recommended the denial of the petition, stating that Plaintiff's reclassification request was not justified.  (D. Exhibit M).

29. On September 25, 2014, President González announced that due to financial constraints, the agency would temporarily halt all personnel transactions not already budgeted and which would affect the agency's budget.  (D. Exhibit R).

30. On January of 2015, President García became Acting President of the CEE, following the resignation of President González.  (D. Exhibit N, p. 12, l. 25; p. 12, l. 13-22).

31. President García became the CEE's permanent President in May 2015.  (D. Exhibit N, p. 12, l. 25; p. 13, l. 1-4).

32. Prior to ascending to the presidency, President García had begun working for the CEE in 2009, and had held the positions of Electoral Planning Analyst, Alternate Electoral Commissioner, Second Vice-President, and First Vice-President.  (D. Exhibit N, p. 11, l. 15- 25; p. 12, l. 1-15).

33. After President García was appointed on an interim basis, Ms. Rodríguez received and evaluated a petition by Plaintiff to reclassify three (3) Assistant

Teachers from the Child Care Center to Teachers, with additional duties.  (D. Exhibit O).

34. Plaintiff had proposed the formal reclassification on the basis that, due to an internal reorganization he implemented at the Child Care Center, there had been substantial modifications to their duties and responsibilities, and he had now assigned them duties as Teachers, which they were already carrying out. (D. Exhibit O).

35. Ms. Rodríguez found that the reorganization carried out by Plaintiff had altered the Child Care Center's personnel composition as it had been originally approved by the Office of Management and Budget.  (D. Exhibit O).

36. Ms. Rodríguez further found that Plaintiff's reassignment of the Assistant Teacher's duties should not have been carried out without prior authorization of the CEE's President, and without a proper analysis of the impact the changes would have by the CEE's Human Resources and the Budget offices.   She concluded Plaintiff had acted against the CEE's regulations.  (D. Exhibit O).

37. Ms. Rodríguez also concluded that the reorganization and assignment of duties Plaintiff had spearheaded had been unnecessary, given the needs of the Center at that moment.  (D. Exhibit O).

38. Ms. Rodríguez indicated that the Administrator had acted *ultra vires* in the reorganization and modification of his employees' duties.  Since Plaintiff had already ordered the employees to perform those additional duties, she opined they should be compensated for that work.  She recommended that Acting President García award a wage differential for the school year of $340.00 per

month for two (2) of those employees, and of $266.00 per month for the third one.  (D. Exhibit O).

39. On February 24, 2015, Acting President García received a written communication from one of the Assistant Teachers requesting her intervention regarding the pending reclassification request, as no answer to the petition had been received.  (D. Exhibit P).

40. On April 20, 2015, Plaintiff also sent Acting President García a letter requesting the approval of the reclassification petition. Plaintiff stated that he had discussed the matter in May 2014 with former President González, who at that time gave Plaintiff the green light "to submit the request for reclassification of the posts."  (D. Exhibit Q).

41. Plaintiff also stated in his letter that in November 2014, the Human Resources Director requested postponing those personnel transactions until such time the agency's fiscal situation allowed for it due to the budgetary freeze former President González had called for. Nevertheless, he stated, the Assistant Teachers had continued carrying out the extra functions assigned to them and had not received compensation commensurate with those additional duties. (D. Exhibit Q).

42. On June 30, 2015, President García terminated Plaintiff from this position for lack of trust.  (D. Exhibit S).

43. President García terminated Plaintiff from his position as Center Administrator because he failed to comply with the administrative and cost-saving measures that the agency was implementing at that time.  Pursuant to

the reorganization carried out by Plaintiff as Administrator, the Assistant Teachers were requesting extra compensation for the additional services rendered and had a valid claim thereto.  The reorganization had been carried out without a prior analysis by the Human Resources Department or authorization by the CEE's president.  (D. Exhibit T, p. 124, l. 1-21).

44. These financial commitments and the reorganization carried out by Plaintiff had a direct fiscal impact on the agency.  (D. Exhibit T, p. 138; l. 2-8; p. 139, l. 4-18; D. Exhibit R).

45. Plaintiff's actions were violations of agency directives regarding cost saving measures, and went beyond Plaintiff's authority as Administrator, as he did not have the authority to conduct such a reorganization.  (D. Exhibit T, p. 141; l. 6-25; p. 142, l. 1-2; p. 144, l. 8-24).

46. In addition to the reorganization and the monetary claims it generated against the agency, other issues that contributed to President García's decision to terminate Plaintiff were the need for identifying funds for other items such as food, activities, uniforms, and awards, additional expenses which were related to the operation of the Child Care Center.  (D. Exhibit T, p. 125, l. 5; p. 126, l. 1-19).

47. President García had also received complaints about the Child Care Center's administration by others at the CEE.  (D. Exhibit T, p. 124, l. 6; p. 125, l. 4).

48. Prior to her leaving the CEE's Presidency in August 2017, President García never found any document by her predecessor authorizing the personnel

transactions pertaining the reorganization Plaintiff had carried out as Administrator. (D. Exhibit T, p. 145, l. 5-12).

49. President García never used a gender or age criteria to hire or terminate agency employees. (D. Exhibit T, p. 152, l. 2-15).

## LEGAL ANALYSIS

Defendants contend that the remaining claims under the ADA and ADEA must be dismissed. Their defense to the Title VII claim is anchored on Plaintiff's job classification. They aver Plaintiff's termination was justified insofar as he occupied a trust position. Additionally, they proffer that the dismissal was not discriminatory since it was based on a valid, legitimate, non-pretextual reason. President García found that Plaintiff's actions in carrying out a reorganization within the Child Care Center without approval and incurring in other costs compromised the agency's budget at a time when cost-cutting measures were being implemented. Therefore, President García lost trust in him, and because he held a trust position and could be dismissed without cause, she did exactly that. As such, Defendants assert that Plaintiff cannot defeat these non-discriminatory reasons. As to the ADEA claim, Defendants posit it is barred by the Eleventh Amendment and must also be dismissed.

Plaintiff's position is that there is evidence pointing to a reasonable inference that Defendants' reasons to terminate him were pretextual due to contradicting testimony offered during Defendants' depositions. He proffers three (3) reasons in support of his Title VII claims, to wit: he was not a trust employee who could be dismissed on a whim but rather, a career employee; that the alleged violation of the order to freeze personnel transactions was a sham because he had prior authorization from the former CEE's

President; and that his replacement was a woman hired in violation of the merit principle. Plaintiff contends this is sufficient evidence from which to reasonably infer that the reasons behind the termination decision were pretextual. Regarding the ADEA claims, Plaintiff failed to offer any argument in support thereof.

## A. Title VII.

"Title VII makes it unlawful for employers to discriminate based on sex." Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013); Ing v. Tufts Univ., 81 F.4th 77, 82 (1st Cir. 2023). In the absence of direct evidence of discrimination, a plaintiff relies on the burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). Under this framework, Plaintiff has the initial burden of establishing a *prima facie* case of discrimination. LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842-44 (1st Cir. 1993). This burden "is not onerous." Texas Dept. of Cmty Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094 (1981).

To do so, Plaintiff must show that: (1) he is a member of a protected class; (2) he performed his job in a satisfactory manner; (3) he was subjected to an adverse action; and (4) the position was filled by a person whose qualifications were similar to his. Pedraza Meléndez v. Ethicon, LLC, Civil No. 21-1249 (PAD), 2023 WL 2771768, at *9 (D.P.R. Mar. 31, 2023); Douglas v. J.C. Penney Co., 474 F.3d 10, 14 (1st Cir. 2007); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000).

If a *prima facie* case is established, a rebuttable presumption of discrimination arises, switching to the employer the burden of articulating a "legitimate, nondiscriminatory reason" for the action at issue. LeBlanc, 6 F.3d at 842. This is a burden of production, not of persuasion, such that the employer is merely required to "set

forth through the introduction of admissible evidence, reasons for its action which would support a finding that unlawful discrimination was not the cause of the challenged employment action." Sánchez v. Puerto Rico Oil Co., 37 F.3d 712, 720 (1st Cir. 1994). The Court, however, must cast a discerning eye, and be mindful that "[c]ourts may not sit as super personnel departments, assessing the merits - or even the rationality - of employers' nondiscriminatory business decisions." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991).

If the employer meets this burden, the presumption arising from the *prima facie* standard is rebutted. Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 430 (1st Cir. 2000). The plaintiff must now identify probative evidence that the reason given by the employer for its action is pretextual, that it is not the true reason but is instead a pretext for discrimination and that sex was one of the motivating factors in the decision. Id.; see also Franchina v. City of Providence, 881 F.3d 32, 53 (1st Cir. 2018).

Given that the burden for establishing a *prima facie* case is not onerous, the Court assumes that Plaintiff established a *prima facie* case of sex discrimination and moves on to Defendants' proffered reasons for the dismissal and the pretext. Pedraza Meléndez, 2023 WL 2771768, at *9.

1. Trust vs. career designation.

Plaintiff's claim is that he held a career position because he competed against others and was hired under the merit principle. Consequently, he avers Defendants' given reason for termination, that he was a trust employee, was pretextual.

Defendants assert in their Motion for Summary Judgment that the position always had a trust designation and Plaintiff has not argued that the classification was incorrect.

That is to say, Plaintiff has never claimed that the position was initially erroneously classified as a trust position when it should have been a career position, but rather that the *hiring process itself* automatically made him a career employee. Thus, Defendants limit their analysis to "how the post was in fact classified, not how it should have been classified."[3]

The Court, like Defendants, has not found any cases dealing with dismissal from a trust position which were not grounded on a First Amendment claim.[4] Plaintiff has instead chosen to bring the matter on a pretext basis under Title VII and has not alleged any of the due process or First Amendment political discrimination arguments normally associated with this type of case. Plaintiff likewise has not argued that he was entitled to a pre-termination hearing to guarantee him the due process rights career employees enjoy, that he had an expectation of continued employment or cited any of the abundant and long held caselaw standing for those propositions. Therefore, the Court agrees with Defendants that, since no First Amendment claim was brought, the issue at this juncture is not whether Plaintiff's position was one where political patronage was required as in a typical case of this nature, but rather whether Plaintiff has established that his hiring process somehow converted him into a career employee.[5] The Court finds it does not.

Puerto Rico law recognizes two (2) categories within the government personnel system, that is, career, and trust employees. P.R. Laws Ann. tit. 3, § 1465 (1) and (2).[6]

---

[3] Docket No. 83, p. 7.

[4] Docket No. 102, n. 4.

[5] If Plaintiff meant to challenge the correctness of the CEE's classification of his position, he failed to clearly articulate this claim. "Judges are not expected to be mind readers." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). "[R]obes and gavels are the tools of a jurist's trade - not tea leaves or crystal balls." Mancini v. City of Providence by & through Lombardi, 909 F.3d 32, 47 (1st Cir. 2018) (quoting United States v. Ladd, 885 F.2d 954, 961 (1st Cir. 1989)).

[6] This statute has now been repealed but was in effect when this cause of action arose. The new statute does not change these definitions in any meaningful way.

Career employees are chosen based on merit after a recruitment and selection process and have a property right and a continued expectation in their continued employment. Id. Confidential or trust employees are those who intervene or collaborate in the formulation of public policy, advise, or render services to the head of the agency or have other confidential duties. Id. They have no expectation of continued employment and are at-will employees. Id.; see e.g., Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287 (1980); Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673 (1976).

Plaintiff's brief offers a lengthy presentation of the facts surrounding the creation of the job and his duties, that other agencies classify the Child Care Center Administrator position on a career basis, and that the Human Resources Director recommended Plaintiff's position have such a designation upon being created, among others. He argues that, because he competed for his position, worked forty (40) hours a week and was on a pay scale akin to career employees, these similarities are enough for the Court to find that he was a career employee.

The relevant undisputed facts, which stand uncontested are as follows: 1) the Child Care Center Administrator was initially hired pursuant to a professional services contract, and was clearly not a career position; 2) the contract Plaintiff signed specifically stated that it was for a specific term and further, did not grant him any additional status or benefits; 3) after the Legislature assigned permanent funds to the program in 2004, Plaintiff's employee status was changed to a transitory trust employee and Plaintiff signed a document so indicating; 4) when the position was later changed to a permanent trust position, Plaintiff was told, in writing, that he was trust employee and could be freely removed from his post; and 5) Plaintiff requested the reclassification of the Administrator

position from trust to career status on two (2) occasions, and was twice denied.  Plaintiff never appealed these administrative decisions.

The facts of this case are very specific.  It is evident that Plaintiff's position began on a contract basis.  The position was later converted into a permanent one, and when that occurred it was created as a trust position and always remained so thereafter.  The facts further show that the initial hiring was done pursuant to a contract which did not grant Plaintiff any benefits other than what was agreed to in said contract.  In fact, the document specifically stated that "this contract shall not have the effect of conferring upon [Plaintiff] status as an employee or official of the Commission, and it shall not entitle him to accrue regular vacation or sick leave, or to receive other benefits not agreed to herein."  See P.R. Laws Ann. tit. 31, §2994 (1930) ("Obligations arising from contracts have legal force between the contracting parties and must be fulfilled in accordance with their stipulations").  Plaintiff's lengthy comparison of his salary and hiring process to those of a career employee cannot controvert the clear terms of the contract he signed, which indicated it did not give him any kind of status as a CEE's employee.

In January 2004, Plaintiff's position was converted into a transitory trust position.  This was done pursuant to Puerto Rico law and was approved by both the CEE's President and the Commonwealth's Office of Management and Budget.  In 2009, the position was then converted to a permanent trust position.  However, throughout this time, the trust characteristic of the job position never changed.  That is to say, the position was always a trust position, and Plaintiff never acquired any benefits other than those granted to a trust employee.  Additionally, at every turn, Plaintiff was explicitly advised that his trust designation did not confer upon him any career employee benefits and that he was subject

to at-will removal.  Plaintiff was cognizant of this fact since he requested the CEE's president on two (2) occasions to reclassify his position from trust to a career employee.

The Court further notes that both times Plaintiff sought reclassification, the analysis performed by the CEE found that nothing had changed that merited the reclassification from a trust to a career position.  In other words, the CEE found that the initial trust classification was correct.  Thus, the fact that the position was always classified as a trust position and that later analyses revealed that a reclassification was unwarranted weighs heavily on the Court's findings.  See Pietri Bonilla v. Alvarado, 762 F.Supp.451, 456 (D.P.R. 1991) ("[w]e believe that a position classified by personnel regulations as trust or confidence creates a presumption that plaintiff's reassignment was proper"); Figueroa-Rodríguez v. López-Rivera, 878 F.2d 1478, 1481 (1st Cir. 1989) (the classification of a position is entitled to some deference); Jiménez Fuentes v. Torres Gaztambide, 807 F.2d 236, 246 (1st Cir. 1986) (legislature's classification system is entitled to deference); Stott v. Haworth, 916 F.2d 134, 142 (4th Cir. 1990) (finding that deference must be given to the decision that designates positions as exempt); Lohorn v. Michal, 913 F.2d 327, 334 (7th Cir. 1990) (state legislature's actions in classifying positions a certain way is entitled to great weight).  Plaintiff was aware of this situation, having sought reclassification twice. Based on this, the Court finds that the position of Child Care Center Administrator was a trust position and Plaintiff was plainly cognizant of this classification.  Accordingly, Plaintiff was subject to at-will dismissal.

Defendants have proffered a legitimate basis for Plaintiff's removal from the position.  However, Plaintiff's turn at the bat in attempting to show pretext from these facts fails.   Plaintiff spills a great deal of ink regarding the creation of his position, his

hiring process, and what the duties of his position were.  While these facts may be uncontested, they are not material for purposes of this claim.  See Kauffman v. Puerto Rico Tel. Co., 841 F.2d 1169, 1171 (1st Cir. 1988) (the existence of an alleged factual dispute does not defeat summary judgment; the factual despite must be regarding a *material* fact).  There is no dispute that Plaintiff competed against others for his position.  Nonetheless, Plaintiff can point to no caselaw that stands for the proposition that a contract-based position with a finite term can somehow later turn into a career position, regardless of the way he was hired. Plaintiff's initial contract could have simply come to an end and not renewed, and he would have ceased working for the CEE pursuant to the clear contractual terms.  The way in which Plaintiff was hired would not have changed this outcome.

Plaintiff likewise fails to cite any authority in support of his argument that competing for a contract job for a fixed term automatically converts it into a career position.  The fact that the position in question here may have shared some characteristics of a career position does not automatically make it so.  Thus, the argument that the hiring mechanism somehow later gave Plaintiff the upper hand and converted a contract employment into a career position is unavailing.

In sum, Plaintiff offers no valid grounds for the Court to find that the reason for his dismissal, that his position was a trust position, was a sham.  Goldman v. First Nat. Bank of Bos., 985 F.2d 1113, 1119 (1st Cir. 1993) ("[T]he totality of the circumstances must permit a reasonable inference that the employer's justification for the challenged action was a pretext for . . . discrimination.").  Plaintiff has provided no evidence to show such pretext.  The job was always classified as a trust position since its inception and the

evidence shows Plaintiff was aware of this fact.  Plaintiff's argument that he understood it to be a career position and that it was so because he competed for it simply finds no basis in law and rings hollow.

      2.  <u>Lack of trust</u>.

The Court could stop at this juncture because Plaintiff occupied a trust position and that is sufficient to find against him.  Trust employees are removable at will, and thus, Plaintiff had no legal expectation of continuity in his employment.

Nevertheless, Defendants offer another argument in support of their petition for summary dismissal, addressing Plaintiff's other pretextual reasons.  They posit that beyond the official designation of the position, Plaintiff violated agency directives and acted *ultra vires*.

Viewed through President García's eyes, Plaintiff failed to implement the budgetary control measures and policies that the agency required at that time.  To this effect, Plaintiff compromised more funds when he reorganized the Child Care Center without a thorough analysis of its impact by the CEE's Human Resources or the Budget Departments.  In this reorganization, Plaintiff reclassified Teacher Assistants as Teachers and assigned them additional duties, which in turn, required extra expenditures by the agency and created a reclassification expectation by those employees.  Plaintiff acted *ultra vires* in so doing.

Plaintiff rebuts this, asserting that he had authorization to perform the reorganization from the previous CEE's president, but the record before the Court does not contain any document where such authorization was ever given, nor did President García ever find such a document.  Plaintiff offers instead the statement of Mr. Sabino

Colón in support of this argument but fails to submit a translation to the English language of said statement, so the Court may not consider it.  See Loc. R. 5(g).

The record before the Court demonstrates that, at the time the Human Resources Department analyzed the impact and need for the personnel transactions Plaintiff requested, he had already implemented them on a temporary basis.  Thus, the employees were already executing the new functions by the time Plaintiff formally asked the agency for the reclassification.  After Plaintiff's petition was made in writing, Ms. Rodríguez analyzed the impact Plaintiff's actions had on the agency.  She found as follows: 1) a Preschool Teacher had been assigned the job of a Teaching Assistant, which was a demotion and thus needed to be reinstated to her former position; 2) Plaintiff's actions altered the office's organization approved by the Office of Management and Budget for the Care Center; 3) Plaintiff lacked the authority to engage in such a reorganization because it needed prior approval by the CEE's president; 4) the president was the only person who had the authority to reorganize a department, an act which could not be delegated (in other words, Plaintiff's actions were *ultra vires*); 5) the Human Resources and Budget Departments needed to analyze the proposed action to determine its impact prior to the reorganization, not afterwards; and 6) the employees in question were reclassified allegedly due to substantial changes in their duties, responsibilities, and authority and Plaintiff failed to evidence the need for these changes.  (D. Exhibit O).  Ms. Rodríguez' conclusions were that "the reclassification of the positions is neither justified nor warranted" but, since the employees had already been performing the additional functions after being ordered to do so by Plaintiff, she recommended they be awarded an additional compensation in the form of a wage differential for the whole school year.  Id.

Plaintiff then attempts to muddy the waters as to the reorganization, arguing that President García admitted in her deposition that the order for the budget freeze occurred after he had reorganized the Child Care Center and after he assigned the employees additional duties, and this somehow demonstrates pretext. This scenario, however, does not get him far.

The record shows that on September 25, 2014, then President González declared a freeze on all personnel actions that would result in payroll increases. This undoubtedly affected the reclassification of positions that Plaintiff had requested, but by that time, he had already ordered those employees to perform the additional duties. In February 2015, one of the affected employees wrote to acting President García as a follow up to the reclassification request. In April 2015, Plaintiff also wrote to Acting President García for the same reason. The timeline was that Plaintiff, in an *ultra vires* fashion, authorized the personnel transactions before the Human Resources and Budget Departments evaluated them. Therefore, by the time the budget freeze was instituted in September 2014 by former President González, the employees were already performing the additional functions. As a result of this, Ms. Rodríguez recommended to Acting President García that the employees be granted a special wage compensation for the school year. Thus, irrespective of the fact that the freeze was implemented after Plaintiff reorganized his department without the necessary authorization, the bottom line is that Plaintiff's actions cost the agency extra money in the compensation of three (3) employees for the extra duties Plaintiff assigned to them at a time when the agency was undergoing budgetary issues and opened the agency to a formal reclassification claim.

The Court finds Defendants' reasons provide ample justification for the dismissal and Plaintiff has failed to establish pretext on these facts.  See Ronda-Pérez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico, 404 F.3d 42, 45 (1st Cir. 2005) (pretext means "deceit -a lie- a made-up story 'to cover one's tracks.'").  Plaintiff has presented no such evidence of lies and deceit in this case, and failed to rebut that his unauthorized actions cost the agency money during a fiscal crunch and required a formal reclassification claim by the teachers.

Failure to abide by company policy and performing *ultra vires* actions has been amply documented to be a valid basis for dismissal. See Padró Octaviani v. GlaxoSmithKline Consumer Healthcare, 239 F.Supp.3d 398, 403 (D.P.R. 2017) (Plaintiff was terminated for not adhering to company policies regarding infractions); Rosado v. Am. Airlines, 743 F.Supp.2d 40, 55 (D.P.R. 2010) (plaintiff dismissed for lack of compliance with drug re-testing procedures and the failure to follow instructions); Fernández v. NCE Foods, Inc., 405 F.Supp.2d 179, 181 (D.P.R. 2005) (cause for dismissal existed when employee violated an employer's internal procedures and failed to follow rules and supervisory instructions."); Menzel v. Western Auto Supply Co., 662 F.Supp. 731, 745 (D.P.R. 1987) (dismissal justified when plaintiff failed to follow supervisor's instructions and repeatedly violated company policy).

Additionally, Plaintiff's attempt to rebut Defendants' amply justified reasons fails for a second reason, as he did not establish that the actions in the present case were undertaken on the basis of sex.  That is, Plaintiff must show that Defendants' given reason was a lie, and he was treated in a different way because he is a man.  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 1002 (1998) ("[T]he critical issue,

Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed") (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 25, 114 S. Ct. 367, 372 (1993)).  In other words, Plaintiff must evidence that he was somehow treated "in a manner which but for that person's sex would be different." Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc., 499 U.S. 187, 200, 111 S. Ct. 1196, 1204 (1991) (quoting Los Angeles Dept. of Water and Power v. Manhart, 435 U.S. 702, 711, 98 S.Ct. 1370, 1377 (1978); Landrau Romero v. Caribbean Restaurants, Inc., 14 F.Supp.2d 185, 189 (D.P.R. 1998) (Plaintiff failed to show that "but for the fact of [his] sex, [he] would not have been the object of the actions", as the actions directed at male and female employees alike); Domínguez-Cruz, 202 F.3d at 431 (the issue is whether, viewing "the aggregate package of proof" offered by plaintiff, he "has raised a genuine issue of fact as to whether the termination was motivated by [sex] discrimination").

Plaintiff attempts to rebut Defendants' proffered reasons arguing that his replacement, a lesser qualified woman, was hired in violation of the merit principle.  This argument is a non-starer, as it is based on the incorrect premise that the Administrator of the Child Care Center was a career and not a trust position.  Thus, the fact that President García hired Plaintiff's replacement without posting a job announcement, without interviewing any other candidates and that the replacement was less qualified than Plaintiff is irrelevant and fails to rebut Defendants' proffered reasons, to wit, that the position was a trust appointment that did not require the agency to follow the merit principle.

More is required than simply juxtaposing his gender versus that of his replacement.  Plaintiff must show that other women were treated differently than men and his removal and replacement was undertaken *because* he was a man.  Noticeably absent from Plaintiff's papers is evidence that women at the CEE were treated more favorably than men, for example, whether they were promoted more often than men or were paid more for the same duties.  Plaintiff fails to show that President García's actions were discriminatory on the basis of sex.

In sum, Plaintiff has failed to rebut Defendants' proffered reason for the dismissal, that Plaintiff committed in *ultra vires* actions contrary to CEE's regulations and did not establish that the actions against him were undertaken on the basis of sex.  Therefore, Plaintiff's claim under Title VII fails.

For all the above reasons, Defendants were justified in dismissing Plaintiff as Administrator of the Child Care Center.  Consequently, Plaintiff's Title VII claims are DISMISSED WITH PREJUDICE.

### B.  ADEA claims.

Plaintiff additionally brought forth a cause of action under ADEA, averring that Defendants also discriminated against him due to his age.  Defendants' position as to this claim is that it should be dismissed, relying on precedent from this district and the First Circuit [7] that established that the Commonwealth of Puerto Rico enjoys Eleventh Amendment immunity from ADEA claims brought against it.  Since this Court had previously ruled that the CEE is an arm of the state, Defendants proffer it is entitled to

---

[7] Irizarry-Mora v. UPR, 647 F.3d. 9 (1st Cir. 2011) and Torres-Torres v. Comisión Estatal de Elecciones, 700 F.Supp. 613 (D.P.R. 1988).

such immunity now.  Plaintiff, in turn, chose instead to focus on the Title VII claim and offered nothing in opposition to this argument.

It has been consistently held that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived".  United Zannino, 895 F.2d at 17; Brown v. Trustees of Boston Univ., 891 F.2d 337, 353 (1st Cir. 1989); Rivera-Gómez v. de Castro, 843 F.2d 631, 635 (1st Cir.1988) ("a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else "forever hold its peace") (quoting Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988).

Having offered absolutely no argument as to this cause of action, the Court finds Plaintiff has waived it.  Accordingly, Plaintiff's ADEA claim is DISMISSED WITH PREJUDICE.

## CONCLUSION

For the foregoing reasons, Defendants' "Motion for Summary Judgment" (Docket Nos. 83, 84) is GRANTED.

This case was reopened for the limited purpose of enforcing of any possible judgment ordering Plaintiff's reinstatement. (Docket No. 28).  It also included a back pay claim under Title VII and an ADEA claim.  (Docket No. 74).  The Court has now dismissed the Title VII and ADEA claims and finds Plaintiff's reinstatement to his former position is therefore not warranted.  The back pay claim was contingent upon the Title VII cause of action and thus, the dismissal of the latter claim entails the dismissal of both.  As no other issues remain alive, this case is DISMISSED WITH PREJUDICE.

Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, on this 22nd day of February 2024.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES DISTRICT JUDGE